IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Houston Specialty Insurance Company, Imperium Insurance Company, and Oklahoma Specialty Insurance Company, <br>      Plaintiffs, <br><br> v. <br><br> First Indemnity Insurance Agency, Inc. <br>      Defendant. | Non-Jury Trial <br><br><br> Civil No. 4:20-cv-3756 |

Complaint

Plaintiffs Houston Specialty Insurance Company ("HSIC"), Imperium Insurance Company ("Imperium"), and Oklahoma Specialty Insurance Company ("OSIC") complain as follows:

Nature of the Action

1.      This is an action for breach of contract and breach of fiduciary duty.  Plaintiffs are insurance companies who contracted with an independent underwriter, Defendant First Indemnity Insurance Agency, Inc. ("First Indemnity"), among other things, to solicit, underwrite, quote, bind, and issue (hereinafter, collectively, "Issue") legal malpractice coverage on Plaintiffs' behalf.  The contract vested First Indemnity with broad authority to Issue coverage on Plaintiffs' behalf without Plaintiffs' prior approval as long as First Indemnity specifically evaluated each risk and followed Plaintiffs' underwriting guidelines.  As Plaintiffs have discovered, First Indemnity ignored the guidelines in a significant number of policies.  As a result, First Indemnity Issued coverage that would not otherwise have Issued, at rates it otherwise would not have approved, resulting in many millions of dollars in losses to Plaintiffs.

1

2.	More specifically, between 2011 and 2019, First Indemnity Issued tens of thousands of policies on Plaintiffs' behalf and collected roughly $25 million in commissions. To date, those same policies have resulted in more than $32 million in losses for Plaintiffs.

3.	In 2019, an audit of sample policies Issued by First Indemnity revealed that First Indemnity failed to perform required due diligence or ignored the results of that due diligence and deviated from the underwriting guidelines. When Plaintiffs hired a new CEO not long after the sample audit, and in the face of continuing significant losses on First Indemnity's accounts, the CEO called for a full audit of First Indemnity's business. First Indemnity immediately terminated the agreement. It has subsequently refused to provide copies of all policies and underwriting files of the coverage it Issued on Plaintiffs' behalf, even though those books and records are the property of Plaintiffs pursuant to the terms of Plaintiffs' agreements with First Indemnity. Plaintiffs file this complaint to recover the losses they sustained due to First Indemnity's breaches and to obtain the originals of their books and records.

## Parties

4.	HSIC is an insurance company licensed by the Texas Insurance Commissioner. HSIC is incorporated in Texas and has its principal place of business in Texas.

5.	Imperium is an insurance company licensed by the Texas Insurance Commissioner. Imperium is incorporated in Texas and has its principal place of business in Texas.

6.	OSIC is an insurance company licensed by the Oklahoma Insurance Commissioner. OSIC is incorporated in Oklahoma and has its principal place of business in Texas.

7.	Upon information and belief, First Indemnity is incorporated and has its principal place of business in Massachusetts.

Jurisdiction and Venue

8. This court has jurisdiction under 28 U.S.C. § 1332(a). No Plaintiff is a citizen of the same state as the Defendant, and the amount in controversy exceeds $75,000. Specifically, Plaintiffs allege that First Indemnity's breaches resulted in millions of dollars in losses, which Plaintiffs seek to recover in damages.

9. Venue is proper under 28 U.S.C. § 1391(b), as "a substantial part of the events . . . giving rise to the claim occurred" in this judicial district. Furthermore, the Agreement includes a forum selection clause, which, as amended, states that "all actions or proceedings arising out of or relating to this Agreement shall be tried and litigated exclusively in the State and Federal courts located in Houston, Texas, Harris County." Ex. A at 15, 32; Ex. B at 15, 29. First Indemnity expressly agreed "to submit to in personam jurisdiction and venue in Houston, Texas, Harris County." Ex. A at 32; Ex. B at 29. Accordingly, this court has personal jurisdiction over First Indemnity.

Plaintiffs Authorized First Indemnity to Issue Policies on Their Behalf

10. Plaintiffs provide a variety of insurance products, but, until 2011, they did not offer attorney professional liability insurance. First Indemnity is an independent insurance agency owned and managed by Andrew Biggio that for over twenty-five years has specialized in writing professional liability insurance for small law firms. In 2011, Plaintiffs decided to enter that market and formed a contractual relationship with First Indemnity in order to take advantage of First Indemnity's expertise.

11. To that end, in late 2011, Plaintiffs signed a "Program Management Agreement" with First Indemnity that "appoints the Manager [First Indemnity] as its program manager . . . for the purpose of underwriting insurance coverages on behalf of the Company [HSIC, OSIC, and

3

Imperium]."[1]  Ex. A at 2; Ex. B at 2.  The Agreement gave First Indemnity the right to Issue policies to "Law Firms."  Ex. A at 2, 23; Ex. B at 2, 22.  In short, the Agreement authorized First Indemnity to underwrite lawyers professional liability insurance policies on behalf of Plaintiffs.

12. The Agreement later added that First Indemnity "is considered a Managing General Agent as defined by Texas law."  Ex. A at 31; Ex. B at 28.  An MGA is an independent agent vested with underwriting authority by an insurer, or, as Texas law says, "a person, firm, or corporation . . . that is authorized by an insurer to accept or process on the insurer's behalf insurance policies produced and sold by other agents."  TEX. INS. CODE § 4053.001(3).  As an MGA and under the terms of the Agreement, First Indemnity could Issue policies on Plaintiffs' behalf without obtaining Plaintiffs' approval.

<u>The Agreement Describes First Indemnity as a Fiduciary</u>

13. Given First Indemnity's broad authority to Issue insurance policies, the Agreement describes First Indemnity as a fiduciary.  For example, the Agreement says that First Indemnity "shall be obligated to fully account for all business written under this Agreement as a trustee of the Company . . . with all legal obligations appertaining thereto that a trustee has to its principal."  Ex. A at 6; Ex. B at 6.  Even more explicitly, the Agreement says that "[i]n any action or proceeding brought by the Company to recover Trust Funds"—such as premiums owed to Plaintiffs—"it shall be conclusively presumed that [First Indemnity] is a fiduciary of the Company with respect to Trust Funds and is liable to the Company for Trust Funds which have not been timely paid."  Ex. A at 16; Ex. B at 16.

---

[1] Technically, there are two agreements: one between First Indemnity and HSIC, which was later amended to include OSIC, Ex. A at 29, and one between First Indemnity and Imperium.  The two agreements are the same in all material respects unless otherwise noted.  For clarity, Plaintiffs refer to the Agreement in the singular, though Plaintiffs provide citations to both contracts for the court's reference.

4

14. First Indemnity agreed to act in Plaintiffs' best interests. Specifically, First Indemnity agreed to "[p]romote and safeguard the best interests and good name of the Company." Ex. A at 4; Ex. B at 4. First Indemnity acknowledged that the intent of the Agreement was "that the Company shall earn a profit from the issuance of the Policies under this Agreement and, in keeping with that intention, [First Indemnity] agrees to diligently perform its duties under this Agreement in an ethical, legal and professional manner, to the best of its abilities." Ex. A at 2; Ex. B at 2.

15. Texas law also recognizes that an MGA "holds money on behalf of an insured or insurer in a fiduciary capacity and shall properly account for that money as required by law, department rules, and a contract with an insurer." TEX. INS. CODE § 4053.106. More generally, a "fiduciary relationship may arise as a matter of law in a principal-agent relationship. Agency is a consensual relationship between two parties by which one party acts on behalf of the other subject to the other's control." *Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 728 (Tex. Ct. App. 2015) (citations omitted). Thus, by law and under the terms of the Agreement, a fiduciary relationship exists between Plaintiffs and First Indemnity.

<u>The Agreement Requires First Indemnity to Abide by the Underwriting Guidelines</u>

16. First Indemnity's authority to Issue policies on Plaintiffs' behalf was not limitless. First Indemnity could Issue them "only in accordance with," among other things, "the Underwriting Guidelines and pricing standards . . . established by the Company." Ex. A at 2; Ex. B at 2. The Underwriting Guidelines are defined as:

> The practices, procedures, and criteria to be used by [First Indemnity] in evaluating each potential Policyholder and determining whether it is appropriate to issue a Policy to each potential Policyholder and, if so, the appropriate coverages to be issued and premium to be charged for each Policy, as approved by the Company and in compliance with all applicable Laws.

5

Ex. A at 22; Ex. B at 22. In the Agreement, the Plaintiffs "reserve[] the right to modify the Underwriting Guidelines in [their] sole discretion at any time, provided no such modification shall be binding on [First Indemnity] until [First Indemnity] receives prior written notice of such modification." Ex. A at 22; Ex. B at 22. The Underwriting Guidelines are incorporated into the Agreement, which says that the Underwriting Guidelines "shall bind the parties as though a part of this Agreement." Ex. A at 18; Ex. B at 18.

17. Underscoring the importance of First Indemnity's need to follow the Underwriting Guidelines, the Agreement lists the following among First Indemnity's "duties and responsibilities":

- "Each policy quoted and bound under this Agreement shall use the rates, rules and Underwriting Guidelines specifically approved in writing by the Company and in force at the time of quoting and binding."

- "Comply fully and promptly with the Underwriting Guidelines, rates and rules approved in writing by the Company."

- First Indemnity "shall not change how the Underwriting Guidelines are applied without the prior written approval of the Company."

Ex. A at 3; Ex. B at 3.

18. First Indemnity has no authority under the Agreement to deviate from the Underwriting Guidelines. The Agreement says that First Indemnity must "[b]ind risks only in accordance with . . . the Underwriting Guidelines . . . , and to forward all other risks to [the] Company, prior to binding for review and possible acceptance at the Company's sole discretion." Ex. A at 2–3; Ex. B at 2–3. In other words, if First Indemnity wants to Issue a policy for Plaintiffs that is not consistent with the Underwriting Guidelines, then First Indemnity must refer the policy to Plaintiffs for approval.

### The Records for the Insurance Policies Under the Agreement Belong to Plaintiffs

19. Because Plaintiffs provide coverage under the insurance policies, the Agreement is clear that the records of and related to those policies belong to Plaintiffs. "The originals of all Records are the property of the Company and must be given to the Company upon demand." Ex. A at 5; Ex. B at 5. "Records" is a defined term and means:

> the Manager's separate, identifiable, complete, accurate, orderly and timely underwriting books, files, records and accounts of all business and transactions pertaining to the Policies and all other matters relating to this Agreement including, without limitation, all electronic and paper records pertaining to the Policies, underwriting files, accounting records and communications with the Company, Policyholders, regulators, reinsurers and insurers.

Ex. A at 21–22; Ex. B at 21–22. First Indemnity is entitled only to "retain copies of the Records." Ex. A at 5; Ex. B at 5.

### The Underwriting Guidelines Describe Which Applications Should Be Approved, Denied, or Referred to Plaintiffs

20. The Underwriting Guidelines provide detailed instructions to First Indemnity as to how it must evaluate potential policies. First Indemnity acknowledged and agreed that the Underwriting Guidelines "must be adhered to as minimum standards." The Underwriting Guidelines place potential policies into three categories: target accounts, ineligible accounts, and referrals.

21. The Underwriting Guidelines went through several iterations after 2011, but the target account described in the guidelines remained the same. Broadly speaking, the target account is a law firm with 50 or fewer attorneys, strong procedures and controls, and a favorable claims history. For firms that fit this profile, First Indemnity may Issue policies for a term of up to 12 months with coverage limits up to $2,000,000 per claim/$4,000,000 in aggregate. (In later versions

of the Underwriting Guidelines, the approved coverage limits reach up to $5,000,000 per claim/$5,000,000 in aggregate.)

22.     The Underwriting Guidelines also identify ineligible accounts.  Among others, the following profiles render an account ineligible:

- Firms with over 100 lawyers;
- Firms with claims frequency and severity that have not taken remedial steps to prevent future claims;
- Firms that practice Mergers/Acquisitions for public clients or that perform SEC services for public clients;
- Attorneys who act as investment brokers or money managers;
- Firms that own collection agencies;
- Firms that have declared bankruptcy.

Later versions of the Underwriting Guidelines identify additional ineligible practice areas—such as intellectual property, and legal and medical malpractice—and prohibit binding coverage for law firms with practices located in certain counties.  First Indemnity has no authority to Issue policies on behalf of Plaintiffs for ineligible accounts.

23.     The Underwriting Guidelines identify other accounts, called "Referrals," that First Indemnity must submit to Plaintiffs for written approval before it may Issue policies.  The Underwriting Guidelines require First Indemnity to refer the following accounts:

- Firms with more than 50 attorneys;
- Accounts with losses over a certain amount (the Underwriting Guidelines originally set the amount at $100,000, and later lowered it to $50,000);
- Firms that require a deductible or SIR (self-insured retention) over a certain amount (the guidelines originally set the amount at $200,000, and later lowered it to $50,000);
- Firms seeking policy coverage that exceeds a certain amount (the guidelines originally set the cap at $2 or $4 million, and later raised it to $5 million);

8

- Firms seeking coverage requiring an annual premium that exceeds a certain amount (versions set this amount at $650,000, $100,000, and $50,000, respectively);

- Firms with certain practice areas, such as patents, intellectual property, copyright or trademarks, class action litigation, and international practices.

For referrals, First Indemnity must submit to Plaintiffs "a complete Account Summary which clearly identifies the reason for the referral, the underwriter's recommendation and includes all supporting information, including the underwriter's suggested pricing."

### The Underwriting Guidelines Describe How First Indemnity Should Calculate Premiums

24.     The Underwriting Guidelines also spell out, in detail, how First Indemnity is to calculate the premiums charged to an insured. The guidelines emphasize that First Indemnity must follow those instructions:

- "Premiums shall be computed in accordance with current rate schedules and formulas used in the product manual."

- "Pricing and rating of accounts must be performed using currently approved or filed rates, documented credits or debits, and appropriate rate modification factors."

- "Accounts must be priced in accordance with Company's approved rates and rules."

The instructions for calculating premiums are crucial: they ensure that the risks for each insured's policy are properly accounted.

### The Underwriting Guidelines Require First Indemnity to Keep Detailed Records

25.     The guidelines note that "[i]t is important that the underwriting file contain information that documents the underwriting selection and pricing process." For this reason, "the underwriting file must contain *at a minimum* the following:"

- The policy application and relevant sub-applications, signed by the insured;

- Detailed underwriting evaluation and suggested pricing worksheets;

- Correspondence;

9

- Underwriter's Notes to file;

- Account/Risk Summary;

- Premium Worksheet;

- Pricing Worksheet—documenting underwriting decisions; and

- Documentation of experience and schedule rating credits or debits.

Of course, under the Agreement, these records belong to Plaintiffs. Ex. A at 5; Ex. B at 5.

Plaintiffs Paid First Indemnity $25 Million in Commissions
for Policies that Have Resulted in More Than $32 Million in Losses to Date

26. First Indemnity began to sign up law firm insureds in 2011. The number of policies Issued quickly increased from 8 in 2011 to 4,482 in 2019. Over that same period, First Indemnity collected roughly $25 million in commissions from Plaintiffs.

27. First Indemnity's program management agreements did not include a provision tying commissions to loss ratios. As a result, First Indemnity could, by ignoring guidelines and undercharging premiums, collect generous commissions even if it wrote unprofitable policies. That's exactly what happened here.

28. Plaintiffs expected its combined loss ratio for this portfolio to be approximately 70%. But the insurance policies First Indemnity Issued on Plaintiffs' behalf have, over time, put Plaintiffs significantly in the red. Plaintiffs' combined loss ratio exceeds 118%, leading to more than $32 million in cumulative losses. And because the claims on the policies First Indemnity wrote continue to mature, Plaintiffs' losses will continue to grow.

Plaintiffs Discover that First Indemnity Violated the Underwriting Guidelines

29. As losses began to mount over time, Plaintiffs addressed them by tightening the guidelines. In 2015, Plaintiffs lowered the threshold for triggering a required referral from $200,000 to $50,000 for deductibles, and from $650,000 to $100,000 for premiums. They also

10

added practices with class actions to the list of required referrals, and practices representing high-profile divorces and entertainers to the list of ineligible accounts. Plaintiffs further directed First Indemnity to increase premiums. Despite these steps, the losses continued to grow.

30. In light of the continuing losses, Plaintiffs conducted an audit of sample files from First Indemnity's book of business in March 2019. The audit disclosed missing records in a sizable proportion of the files reviewed:

- About one third of the files reviewed in the audit included binders—that is, the signed insurance agreement—did not match the underlying policy.

- Another third did not contain complete data about the applicant's loss history, as required by the Underwriting Guidelines.

- When loss activity was reported, the files often contained no details or analysis relating to the losses, including for a number of losses exceeding $25,000, even though the Underwriting Guidelines require First Indemnity to provide a written description of any individual loss greater than $25,000, including cause, current status, and preventative measures taken.

- Similarly, though the Underwriting Guidelines require that the underwriter analysis and decision on underwriting considerations must be fully documented in the account file, the audit revealed that the rationale for the pricing approach chosen was not usually detailed.

- The files did include pricing worksheets, but they routinely contained the same "boilerplate" language that often did not align with the actual characteristics of the account.

- In one example, the worksheet said that the applicant did not practice in products liability, but the application showed that 5% of the firm's practice was products liability.

- In at least four files, the number of attorneys in the firm or the areas of practice used in pricing did not align with the information shown on the application.

31. Most importantly, the audit uncovered that First Indemnity Issued some policies without authorization. These policies either (1) were ineligible, (2) should have been referred to Plaintiffs and were not, or (3) did not charge the approved rates. The audit noted the following examples:

11

- First Indemnity assigned one policy a rating used for closed claims with a total payment of less than $25,000, when the policy had "a paid out loss of $210,000.

- First Indemnity used a rate indicating no incurred losses over the past five years, but the policy in question had incurred expenses on two reported claims in that time period, worth $163,760 and $50,000, respectively.

- First Indemnity applied a large credit despite a recent loss on the policy.

- New business accounts that had experienced significant large losses in the past were Issued for small premiums, sometimes aggressively priced by applying credits, without explanation.

- First Indemnity failed to refer seven cases when losses greater than $100,000 had been incurred, in direct contravention of the Underwriting Guidelines.

- Several accounts were not referred despite having more than 30% exposure to certain practice areas requiring referral.

- Another account involved with class action litigation was not referred as required by the guidelines.

- First Indemnity issued another policy that exceeded the cap on coverage without obtaining prior approval as required by the guidelines.

32. Following the audit, Plaintiffs tightened the Underwriting Guidelines further. The changes included setting a minimum pricing standard, lowering the threshold for triggering referrals, and making firms with practices in certain counties ineligible. Plaintiffs tightened the Underwriting Guidelines twice more in December 2019 and February 2020. In the latter version, the guidelines directed First Indemnity to refer all potential policies Issued on behalf of HSIC for approval.

33. In June 2020, HSIC's founder retired as CEO and was replaced by Andrew Robinson, who had been a high-level executive at Hanover Insurance Co. When Robinson discovered that First Indemnity's portfolio had resulted in $32 million in losses, he immediately began a top-to-bottom review of HSIC's entire insurance portfolio. As soon as Biggio discovered

that Robinson had become the new CEO, he sent a letter providing notice that he was terminating the Agreement.

34. On June 5, 2020, Plaintiffs sent First Indemnity the final version of the Underwriting Guidelines. Under this version, any new business and any account that has had claims was classified as ineligible. Furthermore, First Indemnity was required to refer for approval before making any quotes, renewing any accounts, or making any mid-term changes in coverage.

35. In September 2020, Plaintiffs sought to download records pertaining to their insurance policies from First Indemnity's system. First Indemnity refused to allow Plaintiffs to access their records.

## Count I

### Breach of Contract for Failure to Turn Over Records

36. Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

37. The Agreement provides that "[t]he originals of all records are the property of [Plaintiffs] and must be given to [Plaintiffs] upon demand." Ex. A at 5; Ex. B at 5. Plaintiffs demanded access to the records for the accounts Issued by First Indemnity on their behalf. In clear violation of the Agreement, First Indemnity refused and continues to refuse to turn over the records.

38. Plaintiffs seek and are entitled to a judgment specifically enforcing this provision of the Agreement between Plaintiffs and First Indemnity, requiring First Indemnity to turn over Plaintiffs' records.

## Count II

### Breach of Contract for Violating the Underwriting Guidelines

39. Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

7688833v1/016952

40. The Agreement requires First Indemnity to "[c]omply fully and promptly with the Underwriting Guidelines, rates and rules approved in writing by" Plaintiffs. Ex. A at 3; Ex. B at 3. Despite limited access to the underlying records, Plaintiffs have discovered numerous examples where First Indemnity deviated from the prescribed rates, neglected to refer high-risk policies to Plaintiffs for approval, and issued policies that were ineligible for coverage. Each of these actions contravenes the Underwriting Guidelines. As a result of First Indemnity's disregard for the guidelines, First Indemnity Issued policies that should not have Issued or should not have Issued at the rates charged.

41. First Indemnity's breaches caused Plaintiffs to suffer tens of millions of dollars in losses.

42. For these breaches, Plaintiffs seek and are entitled to expectation damages, consequential damages, reliance damages, and any other remedy in law or equity that the Court deems appropriate.

## Count III

### Breach of Fiduciary Duty

43. Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

44. A fiduciary relationship existed between Plaintiffs and First Indemnity. First Indemnity was a trusted agent authorized to Issue insurance coverage on Plaintiffs' behalf, including without prior approval if it followed the Underwriting Guidelines. Accordingly, the Agreement describes First Indemnity as a "trustee" and as a "fiduciary." Ex. A at 6, 16; Ex. B at 6, 16. Furthermore, the Agreement appoints First Indemnity as a Managing General Agent on behalf of Plaintiffs, and Texas law establishes that a Managing General Agent is a fiduciary on behalf of the insurer. TEX. INS. CODE § 4053.106. First Indemnity's fiduciary duties included,

14

among other things, the duty of loyalty, the duty of care, the duty of good faith, and the duty of disclosure. These duties obligate First Indemnity to act in Plaintiffs' best interests, and to only Issue policies that it reasonably believed would be profitable.

45. First Indemnity breached its fiduciary duties by, at a minimum, carelessly Issuing policies and failing to exercise due diligence. Instead of carefully considering the merits of applicants for insurance, First Indemnity approved policies using boilerplate analysis that often did not consider the actual relevant facts of the individual insured. Additionally, First Indemnity made nonsensical rating decisions, such as rewarding policies with large claims by lowering their premiums. First Indemnity's breaches of fiduciary duty cost Plaintiffs millions of dollars.

46. Plaintiffs seek and are entitled to actual damages, disgorgement of profits, and any other remedy in law or equity that the Court deems appropriate.

## Prayer for Relief

47. Plaintiffs are entitled to relief and respectfully request that:

(1) This Court order First Indemnity to comply the Agreement and turn over all records relating to the policies it Issued on behalf of Plaintiffs;

(2) Plaintiffs recover expectation damages, consequential damages, reliance damages, actual damages, and disgorgement of profits as provided by law and that this Court enter judgment against First Indemnity on behalf of Plaintiffs;

(3) Plaintiffs recover the costs of the suit, including attorneys' fees and expenses, as provided by Texas Civil Practice & Remedies Code § 38.001(8), and pre- and post-judgment interest; and

(4) Plaintiffs recover such other relief as the Court deems proper.

Dated: November 3, 2020                      Respectfully submitted,

By: */s/ Shawn Raymond*
Shawn Raymond
Texas State Bar No. 24009236
S.D. Admissions No. 26202
sraymond@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
Fax: (713) 654-6666

*Attorney-in-Charge for Plaintiffs*

OF COUNSEL:

Mary Kathryn Sammons
Texas State Bar No. 17556100
S.D. Admissions No. 10657
ksammons@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
Fax: (713) 654-6666

16